Filed 11/17/15  P. v. Salas CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E063029 |
| v. | (Super.Ct.No. RIF1304971) |
| JIMMY RAY SALAS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Michael B. Donner, Judge.  Affirmed.

Jimmy Ray Salas, in pro. per.; and Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

On October 9, 2014, a jury found defendant and appellant Jimmy Ray Salas guilty of inflicting corporal injury on a spouse or cohabitant resulting in a traumatic condition

(Pen. Code, § 273.5, subd. (a));[1] assault with a deadly weapon other than a firearm, to wit, bolt cutters (§ 245, subd. (a)(1)); and assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)). Defendant subsequently admitted that he had suffered one prior prison term (§ 667.5), one prior serious felony conviction (§ 667, subd. (a)), and one prior strike conviction (§§ 667, subd. (c) & (e)(1), 1170.12, subd. (c)(1)). As a result, defendant was sentenced to a total term of 11 years in state prison with credit for time served. Defendant appeals from the judgment. We find no error and affirm.

I

FACTUAL AND PROCEDURAL BACKGROUND

In May 2013, defendant resided with his then-girlfriend J.H. (the victim) in an apartment with their baby and the victim's two other young children from a previous relationship. Defendant and the victim had been in a relationship on and off for approximately three years.

Prior to midnight on May 30, 2013, the victim angrily confronted defendant regarding his alleged drug use while the children were in their bedroom. Defendant became angry, raised his voice, and began swearing at the victim and calling her derogatory names. After defendant pushed the victim to the ground twice, the victim grabbed some nearby scissors to protect herself because she was scared. She held the scissors tight by her side and told defendant not to touch her again. Defendant grabbed some bolt cutters that were under the couch and hit the victim on the arm several times,

_____

[1] All future statutory references are to the Penal Code unless otherwise stated.

2

causing the victim to drop the scissors and resulting in discoloration to the victim's arm from her elbow to her wrist. The victim was crying during the entire incident.

The victim eventually left and went to her mother's house. However, because she did not want to wake her mother, she waited there for a while, and then went back to the apartment at around 5:00 a.m. the following day, May 31. When she returned, she got ready for work, and returned to the apartment around 3:00 p.m. Defendant was at the apartment, and the two of them began arguing in their bedroom. During the argument, defendant pushed the victim against the crib, and then pushed her down to the bed. Defendant grabbed the victim by the throat, as she was lying backwards on the bed, and defendant began slapping the victim. The victim was scared and was flailing her hands in the air trying to get defendant off of her. During the slapping, defendant hit the victim with his hand or knuckle on her chin, causing a bruise to her chin. At some point, defendant kicked the victim on her right side.

The victim eventually left the apartment with her children and went to a friend's house. The victim returned to her apartment sometime either on May 31 or June 1, 2013. Around 5:00 or 6:00 a.m. while the victim was asleep in her bedroom, defendant returned to the apartment and entered through the bedroom window. When he noticed the victim's injuries on her face, he asked her how they happened. The victim told defendant that he had done that to her, and defendant apologized. The victim told defendant that he needed help and that he was being a "monster." The victim believed defendant felt terrible. Defendant stated that he did not believe he belonged there, and left the apartment.

3

Later that morning around 7:00 a.m., the victim's mother came to the apartment. The victim told her mother what had occurred and showed her mother the injuries. The victim's mother called the police.

Officer Wade Arens responded to the call and spoke with the victim. During their conversation, Officer Arens observed and photographed the victim's injuries. The officer believed that the victim's right forearm injuries were consistent with defensive wounds and being hit with bolt cutters and that the victim's injuries to her face were consistent with someone who had been punched. During the interview, the victim was crying and emotional and appeared reluctant to tell the officer what had happened. The victim eventually discussed the incidents with Officer Arens.

Officer Arens recorded the interview, but did not tell the victim that he was doing so. The interview was transcribed, and the tape of the interview was played for the jury at the time of trial. At trial, the victim minimized the abuse and asserted at various points that she did not remember. During the interview, the victim, contrary to her trial testimony, told the officer that during the May 31 incident, defendant had punched her with a closed fist. She also informed Officer Arens that she and defendant and gotten into physical altercations five or six previous times. The following day, on June 2, 2013, Officer Arens arrested defendant at the apartment and retrieved the bolt cutters, which matched the description of those used to strike the victim.

A domestic violence expert testified that some victims of domestic violence stay in relationships, especially when children are involved and victims have no financial means to support themselves. The expert also explained that often times victims minimize their

4

injuries and victims believe they had provoked the batterer or deserved the beating. The expert described various means by which a batterer maintains control in a domestic violence situation, such as using the children, financial pressures, coercion and threats, and emotional abuse. The expert also explained the various phases or "cycle" of domestic violence, such as "tension building," "explosion," and "honeymoon" phases. The actual physical abuse, according to the expert, occurs during the "explosion" phase; and generally, most domestic violence is reported during the "explosion" stage because the abuse actually occurred and the victim is the most upset during that period. In the expert's opinion, it was common for domestic abusers to use household items to instill fear and for purposes of strangulation. The expert concluded that the facts in this case were consistent with the cycle of domestic violence that the expert had described.

Defendant argued that he acted in self-defense in using the bolt cutters once the victim grabbed the scissors. He also attempted to discredit the victim's testimony and claim there was insufficient evidence to support the charges.

Following deliberation, on October 9, 2014, the jury found defendant guilty as charged of inflicting corporal injury (§ 273.5, subd. (a)); assault with a deadly weapon other than a firearm (§ 245, subd. (a)(1)); and assault by means of force likely to cause great bodily injury (§ 245, subd. (a)(4)).

On February 27, 2015, defendant admitted that he had suffered one prior prison term (§ 667.5), one prior serious felony conviction (§ 667, subd. (a)), and one prior strike conviction (§§ 667, subd. (c) & (e)(1), 1170.12, subd. (c)(1)). After the court denied

5

defendant's motion to dismiss his prior strike conviction, defendant was sentenced to a total term of 11 years in state prison with credit of 957 days for time served.

II

DISCUSSION

Defendant appealed from the judgment, and we appointed counsel to represent him on appeal. After examination of the record, counsel has filed a brief under the authority of *People v. Wende* (1979) 25 Cal.3d 436 and *Anders v. California* (1967) 386 U.S. 738, setting forth a statement of the case, a summary of the facts and potential arguable issues, and requesting this court conduct an independent review of the record.

We offered defendant an opportunity to file a personal supplemental brief, and he has done so. In his supplemental brief, defendant argues that the bolt cutters "allegedly" used to strike the victim do not constitute a deadly weapon. We reject this argument.

"As used in section 245, subdivision (a)(1), a 'deadly weapon' is 'any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury.' [Citation.] Some few objects, such as dirks and blackjacks, have been held to be deadly weapons as a matter of law; the ordinary use for which they are designed establishes their character as such. [Citations.] Other objects, while not deadly per se, may be used, under certain circumstances, in a manner likely to produce death or great bodily injury. In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue. [Citations.]" (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028-1029.) Thus,

6

whether a specific item in a given case is a "deadly weapon or instrument" is ultimately a question of fact for the jury.

Examples of such objects which are not deadly per se, but found to be deadly weapons under the particular circumstances have included a screwdriver (*People v. Simons* (1996) 42 Cal.App.4th 1100, 1107), a straight pin embedded in an apple (*In re Jose R.* (1982) 137 Cal.App.3d 269, 276), a pillow (*People v. Helms* (1966) 242 Cal.App.2d 476, 486-487), a large rock (*People v. White* (1963) 212 Cal.App.2d 464, 465), a razor blade (*People v. Richardson* (1959) 176 Cal.App.2d 238, 239), and a fingernail file (*People v. Russell* (1943) 59 Cal.App.2d 660, 665). These objects have in common the fact that, when used in a physical attack on a person, *they are capable of and are likely to produce death or great bodily injury*. In the present matter, the jury could reasonably infer from the evidence, as described above, that the bolt cutters used to repeatedly strike the victim was a deadly weapon. If an object such as a pillow, a straight pin imbedded in an apple, and a razor blade may be found by the trier of fact to be a "deadly weapon or instrument" within the meaning of section 245, certainly a bolt cutter which is capable of and likely to produce great bodily injury should also be considered a deadly weapon.

Defendant also argues that the evidence shows he acted in self-defense in using the bolt cutters to strike the victim and therefore he was wrongfully convicted of assault with a deadly weapon. We disagree.

In determining whether there is sufficient evidence to support a conviction, we review " 'the whole record in the light most favorable to the judgment to determine

7

whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]" (*People v. Cravens* (2012) 53 Cal.4th 500, 507.) "The standard of review is the same in cases in which the People rely mainly on circumstantial evidence." (*Ibid.*) That the evidence may support a finding that defendant acted in self-defense does not mean the evidence is insufficient to support a finding that defendant did not act in self-defense. The jury, not the appellate court, must be convinced of the defendant's guilt beyond a reasonable doubt. (*Cravens*, *supra*, at pp. 507-508.) If the circumstances reasonably support the jury's finding of guilt beyond a reasonable doubt, we will not reverse even if we believe that we might reasonably reconcile the circumstances with a contrary finding. (*Id*. at p. 508.) We will affirm the conviction " 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*Ibid*.)

" 'To justify an act of self-defense for [an assault charge . . .], the defendant must have an honest and reasonable belief that bodily injury is about to be inflicted on him. . . .' The threat . . . must be imminent . . . and '. . . any right of self-defense is limited to the use of such force as is *reasonable* under the circumstances.' [Citation.]" (*People v. Minifie* (1996) 13 Cal.4th 1055, 1064-1065.) Here, there was sufficient evidence from which a jury could reasonably conclude that defendant was not acting in self-defense when he struck the victim with the bolt cutters. Defendant had been treating the victim with hostility after she confronted him about his alleged drug use. He became angry, yelled and cursed at the victim, and pushed her to the ground twice. The victim,

8

who was crying and scared during the entire incident, grabbed some nearby scissors to protect herself from defendant and told him not to touch her again. There was no evidence the victim attempted to attack defendant with the scissors or lunged at defendant with the scissors; rather, immediately after the victim grabbed the scissors, defendant, in response, grabbed the bolt cutters and began hitting the victim's arm several times with the bolt cutters. On the evidence presented, viewed in the light most favorable to the People, the jury could have reasonably found that defendant was not acting in self-defense when he assaulted the victim with the bolt cutters.

Pursuant to the mandate of *People v. Kelly* (2006) 40 Cal.4th 106, we have independently reviewed the record for potential error and find no arguable issues.

## III

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
                                                                P. J.

We concur:

MILLER
                J.

CODRINGTON
                J.

9